PARK-IN THEATRES, Inc. v. PARA-
MOUNT-RICHARDS THEATRES,
Inc., et al.

Civ. A. No. 1072.

United States District Court
D. Delaware.

Dec. 8, 1948.

See, also, D.C., 7 F.R.D. 723.

Arthur G. Connolly, of Wilmington, Del., and Leonard L. Kalish, of Philadelphia, Pa., for plaintiff.

William S. Potter, of Southerland, Berl & Potter, of Wilmington, Del., Charles R. Fenwick, of Washington, D. C., and Gibbons Burke, of New Orleans, La., for the defendants.

RODNEY, District Judge.

This matter arises upon a motion by defendants under Rule 12(b) (6) [1] to dismiss the patentee's complaint, which alleges two causes of action. The first cause of action is for an accounting for royalties under a patent license agreement and the second and alternative cause of action is based upon an infringement of the patent in case the defendants claim their actions have not been had pursuant to the patent license.

The complaint alleges that plaintiff, holding valid patents covering the erection and operation of drive-in theatres, entered into a written agreement of November 20, 1940 with one Elwood R. Clay, a copy of which is attached to the complaint; that attached to and forming a part of such agreement was a blank form of a license agreement identified in the agreement of November 20, 1940 as "Exhibit A," which is also included in the complaint; that Elwood R. Clay, in entering into the agreement, acted as agent or attorney in fact for E. V. Richards, president of Para-

---

[1] Federal Rules of Civil Procedure, 28 U.S.C.A.

mount-Richards Theatres, Inc., one of defendants, and that Richards or Paramount-Richards Theatres, Inc., was the principal in respect to said agreement. The complaint alleges that defendant, Paramount-Richards Theatres, Inc., owns the majority or all of the capital stock of the other defendants and directs and controls their activities and formulates and determines their policies, and that the agreement of November 20, 1940 was assigned by Elwood R. Clay to Paramount-Richards Enterprises, Inc. on or about September 20, 1941, and accepted by that company on October 20, 1941.

The complaint alleges that, pursuant to the terms of the contract of November 20, 1940, defendants or their officers erected, used and operated seven drive-in theatres as follows: three in Louisiana, viz., at Shreveport, Baton Rouge and New Orleans, and one each in Pensacola, Florida, Jackson, Mississippi, Texarkana, Texas and Mobile, Alabama.

The complaint then alleges that defendants made partial and inadequate royalty payments as required by the contract in respect to five of said theatres and up to certain dates set out in the complaint and as to the drive-in theatres erected and operated in Mobile and New Orleans made no royalty payments at all. The complaint seeks the ascertainment of the amount of royalties and judgment for the amount so found to be due.

On the contingency that defendants contend they did not erect, operate or sell the above theatres under the license agreement, plaintiff alleges alternatively a second cause of action for infringement of its patent through such acts and seeks treble damages therefor.

Defendants have moved under Rule 12 (b) (6) to dismiss the complaint upon the ground that it fails to state a claim upon which relief can be granted in that plaintiff is not entitled to any relief for the

reason that it was and is unfairly using its patent monopoly. The motion is bottomed upon Paragraph 3 of the license agreement[2] attached to and allegedly a part of the agreement of November 20, 1940 and Paragraph 3 is in these precise words, "Licensee covenants and agrees that it will not either directly or indirectly promote or aid the making, construction, use or operation of any drive-in theatre not licensed by Licensor."

The plaintiff suggests that four questions are here involved and, with the order somewhat transposed, these questions will be severally considered.

1. "Did Section 3 of Exhibit 3-A in fact appear in any license agreement granted by the plaintiff under the patent in suit?"

The plaintiff contends that Exhibit 3-A is nothing more than a blank form of license agreement which sets out the intention of the parties on November 20, 1940 as to what they thought would be an acceptable form of specific license in the future if and when certain of the patented structures were to be constructed, and that there is nothing in the complaint, to which it contends we are limited, to indicate that such specific license agreement was ever executed by the parties. Plaintiff contends that Exhibit 3-A is not an actual existing agreement insofar as we are concerned on this motion inasmuch as the blanks are not filled in.

The agreement of November 20, 1940 (Exhibit 3) recites that plaintiff is the owner of "certain Letters Patent particularly referred to and described in the form of License Agreement which is attached hereto, made part hereof and marked 'Exhibit A'; and * * * The parties mutually agree that they are contracting herein with respect to certain License Agreements which may hereafter be entered into between them pursuant to the terms hereof, and that said License

[2] As above noted, it is referred to in the agreement of November 20, 1940 as "Exhibit A" thereof. The agreement of November 20, 1940 is Exhibit 3 of the Complaint and the specific license agreement containing Paragraph 3 is Exhibit 3-A of the Complaint. For the sake of brevity, the agreement of November 20, 1940 will be herein referred to as Exhibit 3 and the specific license agreement containing Paragraph 3 as Exhibit 3-A.

Agreement or Agreements, in each instance, shall be in accordance with the "form of License Agreement attached hereto, marked 'Exhibit A', and made a part hereof by reference, as fully as though set forth at this point at length, except that in each instance said License Agreement shall be completed by filling in the blank spaces appearing in said 'Exhibit A' with the proper applicable statements called for by such blanks, such as the date, the location of the theatre, et cetera."

At the outset it might be noted that nowhere in Exhibit 3 itself does there appear the number or title of the Letters Patent which it is recited plaintiff owns and with reference to which the parties contracted. Unless we can look to Exhibit 3-A which does contain the number of plaintiff's patent and recites that it is for a drive-in theatre, there might be some question as to whether Exhibit 3 could be enforceable at all as a complete contract because of indefiniteness.

█ █ It is true there are certain blanks in Exhibit 3-A, but what is the nature of such blanks? Exhibit 3 adopts Exhibit 3-A in toto except that it is provided the license agreement shall be completed by filling in the blank spaces with the "applicable statement called for by such blanks, such as the date, the location of the theatre, et cetera." The date and location of the theatres, i. e., territory covered by the license, are set out in Exhibit 3. Because certain portions of the whole agreement (Exhibits 3 and 3-A) are left blank is no reason in itself to hold the complete and definite portions unenforceable. A contract is not invalidated and cannot be avoided merely because part of it was blank when entered into or because certain of its terms were to be exactly fixed at a future time. Eno v. Prime Mfg. Co., 314 Mass. 686, 50 N.E.2d 401, 405; Kirkman Corp. v. Owens et al., 62 Cal.App.2d 193, 144 P.2d 405, 407; McTee & Co., Inc. v. Brown Fun. Home, Inc., La.App., 183 So. 558, 559. I see nothing so essential to the blank portions of this agreement to warrant a holding that the agreement is invalid or unenforceable in its completed parts.

█ It is not necessary that the spaces for signatures of the parties to Exhibit 3-A be filled in, because Exhibit 3-A is part of Exhibit 3 and the latter instrument is signed by both parties. The terms of Exhibit 3-A do not merely indicate what the parties thought would be an acceptable form of license agreement in the future, but rather they are specific covenants and obligations which the parties accepted when they signed Exhibit 3 and one of these binding covenants is Paragraph 3.

Exhibit 3 makes Exhibit 3-A a part thereof "as fully as though set forth at length." I am of the opinion that Exhibits 3 and 3-A constitute the agreement between the parties and that Paragraph 3 of Exhibit 3-A was an existing part of the agreement of November 20, 1940 and must be so considered by me.

2. The second question suggested by the plaintiff is, "Does the complaint establish that the license agreement has not been cancelled or modified and that Section 3 is still in effect therein?"

Plaintiff contends that even if Exhibit 3-A is an actual existing agreement, yet it is incumbent upon the defendants on this motion to show that the agreement is still in effect and that plaintiff has not purged itself of any unwarranted provision by cancelling or amending the agreement, since the patent becomes enforceable as soon as any illegal provision has been modified and its effect dissipated.

█ There is ample authority indicating that a patentee who has been misusing its patent monopoly may maintain infringement proceedings once it is determined that the improper practice has been abandoned and its consequences dissipated. Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 493, 315 U.S. 788, 62 S.Ct. 402, 86 L. Ed. 363; B. B. Chemical Co. v. Ellis, 314 U.S. 495, 498, 62 S.Ct. 406, 86 L.Ed. 367; National Lockwasher Co. v. George K. Garrett Co., 3 Cir., 1943, 137 F.2d 255, 256; Campbell v. Mueller, 6 Cir., 1947, 159 F.2d 803, 806, 807; United States v. Vehicular Parking, Ltd., D.C.Del., 54 F.Supp. 828, 835; Id. 61 F.Supp. 656, 658.

Plaintiff here filed its complaint and attached thereto a copy of the whole agreement of November 20, 1940 (Exhibits 3 and 3-A). Pursuant to Rule 10(c), the copy is a part of the complaint for all purposes. Defendants have moved to dismiss on the ground that the complaint as filed shows that the plaintiff is not entitled to relief. Plaintiff included in its complaint the agreement containing the provision objected to and is chargeable with the implications of such provision. It would seem that any affirmative duty should be upon the plaintiff to show in its complaint as filed that any objectionable provision has been eliminated.[3] In connection with this point, the Supreme Court has stated that "It will be appropriate to consider petitioner's [plaintiff-patentee's] right to relief when *it is able to show* that it has fully abandoned its present method of restraining competition * * * and that the consequences of that practice have been fully dissipated." B. B. Chemical Co. v. Ellis, 314 U.S. 495, 498, 62 S.Ct. 406, 408, 86 L.Ed. 367 (emphasis supplied).

It might be mentioned at this point that, subsequent to oral argument and the filing of briefs upon the instant motion, counsel for plaintiff has notified the court by letter that the agreement of November 20, 1940 was cancelled by plaintiff by letter of April 28, 1948 to defendant, Paramount-Richards Enterprises, Inc. If this fact be formally presented to the court it may then be necessary to determine what effect, if any, such cancellation would have upon any matter then pending before the court.

3. The third question as suggested by the plaintiff is, "Does section 3 attempt to extend the bounds of plaintiff's lawful monopoly beyond the scope of its patent?"

The exact text of Paragraph 3 is that "Licensee covenants and agrees that it will not either directly or indirectly promote or aid the making, construction, use or operation of any drive-in theatre not licensed by Licensor."

Defendants contend that the above language of Paragraph 3 restricts the licensee from directly or indirectly promoting or aiding the construction or operation of any type of drive-in theatre not covered by the plaintiff's patent, i. e., competing and non-infringing drive-in theatres. The defendants contend, then, that this case falls clearly within the rulings of National Lockwasher Co. v. George K. Garrett Co., 3 Cir., 1943, 137 F.2d 255, and McCullough v. Kammerer Corp., 9 Cir., 1948, 166 F.2d 759, certiorari denied 335 U.S. 813, 69 S.Ct. 30.

Plaintiff's contention is that Paragraph 3 has reference only to the type of drive-in theatre covered by its patent and constitutes nothing but an innocuous commitment on the part of the licensee that during the period of the license agreement he will not be an accessory to any unlicensed infringement of the patent. Plaintiff also urges that any doubt that might exist must be resolved in its favor on this motion to dismiss.

Plaintiff urges that "drive-in theatre" in Paragraph 3 is not a generic term but rather has a distinctive meaning limited to drive-in theatres covered by the claims of its specific patent. It contends that Paragraph 3 is solely directed to its specific patented structure when infringed upon by people who have no license from the plaintiff, and the only reason for including the paragraph was to ensure that the licensee would not aid and abet an unauthorized infringement—especially by using plans and specifications furnished to licensee by licensor—of the specific patent.

There is nothing in the agreement or conduct of the parties to indicate that "drive-in theatre" relates only to the type covered by plaintiff's patent. I think the term may refer to any type of drive-in theatre, whether covered by plaintiff's patent or not. The term "any drive-in theatre" covers any type of such theatre, and there has been nothing shown to me

---

[3] It has been stated that "the condition of an instrument once proved to exist is presumed to continue until a modification or addition is proved." Curtis v. Cutler, 4 Cir., 76 F. 16, 19, 37 L.R.A. 737; see also 20 Am.Jur., Evid. Sec. 207, p. 205. See also United States v. Vehicular Parking, Ltd., D.C.Del., 54 F. Supp. 828; Id. 61 F.Supp. 656, 658.

which indicates that the term has a distinct or confined meaning limiting it solely to a theatre covered by the plaintiff's patent, nor do I understand that the term has developed any such limited meaning in the particular trade involved.

 While plaintiff's patent may be for a drive-in theatre, it has no such specific title as the term "title" is normally understood. A patent is commonly known and designated by its Letters Patent number and plaintiff's patent has United States Letters Patent No. 1,909,537. The pertinent statute[4] requires that "every patent shall contain a short title or description of the invention or discovery * * *" but the term "title" has apparently always been used synonymously with "description,"[5] so of course, in addition to having a letters patent number, a patent does contain a title but such title has no distinct or specific implication or significance. It is only helpful in leading to a better understanding of the invention or discovery. Plaintiff cannot rely upon the title of its patent as limiting the ordinary meaning and connotation of the term "drive-in theatre" in Paragraph 3 of the license agreement.

 Exhibit 3-A is headed as a "License Agreement Respecting U. S. Patent No. 1,909,537 Issued May 16, 1933." The agreement recites that plaintiff is the owner of said patent "for drive-in theatres and may thereafter have issued to it and may hereafter acquire other United States Letters Patent relating to drive-in theatres." Certainly this is a recognition that there exists or may futurely exist other inventions or discoveries relating to drive-in theatres; such recognition is not consonant with a belief that "drive-in theatres" are or can be only those covered by the claims of the specific patent. Indeed, the agreement continues to recite that the licensee desires to make and operate an outdoor drive-in theatre *embodying the invention forming the subject matter of the specific patent.* And in Paragraph 16 of the agreement the licensee agrees to display on its licensed theatre a sign indicating that such theatre is licensed under the specific patent and *"including the numbers of any other patents which may hereafter be owned by Licensor applicable to the drive-in theatre * * *"*

By Paragraph 20 of Exhibit 3-A plaintiff agrees to defend at its own expense any suit against the licensee where it is alleged that "the theatre built and operated" by licensee under the agreement infringes *any other patent,* provided that licensee has built and operated its theatre in compliance with the plans and specifications of plaintiff's specific patent. Furthermore, plaintiff agrees to hold licensee harmless against any loss by reason of any such infringement. This is certainly an acknowledgment of the possibility of other similar types of structures covered by different patents.

One might consider what geographical area was contemplated by Paragraph 3. Did the paragraph attempt to limit the activities of the defendants throughout the world or did the paragraph relate solely to the territory as to which the parties were contracting? Obviously it was the latter. But within that territory the defendants had an exclusive license to use patent No. 1,909,557. For use within that territory the plaintiff could grant no rights under the patent to anyone other than the defendants. Within that territory there could be no other drive-in theatre licensed by the licensor. When, therefore, the plaintiff expressly stipulates that the defendants should not, directly or indirectly, be concerned in the "making, construction, use or operation of any drive-in theatre not licensed by the licensor" it must, since no drive-in theatre under the stipulated patent could be licensed by the licensor, refer to one of two kinds of drive-in theatres: (a) a drive-in theatre in com-

---

[4] R.S. § 4884, 35 U.S.C.A. § 40.

[5] It has long been established, for example, that the title of a patent cannot be used to distinguish the invention from another but may only receive consideration as an aid to clarifying or giving significance to the language used in describing the individual elements, Nye Tool & Machine Works v. Crown Die & Tool Co., 7 Cir., 292 F. 851, 853, and an older authority recognized that a patentee is not controlled by the title of his patent. Bell v. Daniels, C.C., S.D.Ohio, Fed.Cases No. 1,247.

petition with but infringing the patents of the plaintiff, or (b) a drive-in theatre in competition with and not infringing the patents of the plaintiff.

Infringing theatres coming within the classification (a) are made the express subject of consideration in Paragraph 22 of the agreement. By that paragraph it is the express duty of the licensor to bring proceedings against infringing parties within three months of the time that notice of the existence of the infringement is given. It is true that Paragraph 3 might conceivably still apply to a drive-in theatre in competition with but infringing the patents of the plaintiffs as shown by classification (a), and as contended by the plaintiff, but to have such effect the words "not licensed by the licensor" in Paragraph 3 are entirely meaningless and innocuous since no license could be given by the patentee within the territory to any third party.

Paragraph 3, on the other hand, applies with full force and without the deletion of any word to the classification (b) as above set out. By Paragraph 3 the licensee is prohibited from being concerned with any drive-in theatre not licensed by the licensor. By the paragraph the licensee is prohibited from being at all concerned with any drive-in theatre in competition with and not infringing the patents of the plaintiff. Thus competitive processes are or may be stifled and the patent monopoly of the plaintiff enlarged.

Finally, it might be pointed out that while one of plaintiff's reasons in support of its contention as to the meaning of Paragraph 3 is that licensee is given all the plans and specifications for the structure and hence licensor needed some assurance that licensee would not use them for an unlicensed structure, there seems to be ample protection for the licensor in Paragraph 2 of Exhibit 3-A. In such paragraph licensee agrees that the plans and specifications are only loaned to him for his use in making an outdoor drive-in theatre in the licensed territory and he covenants to make or permit no other use of such plans and specifications.

Having arrived at the conclusion that the effect of Paragraph 3 is to prevent the defendants from directly or indirectly promoting or aiding the making, construction, use or operation of any drive-in theatre in competition with and not infringing the patent of the plantiff, I must consider this result in connection with the approriate law and especially that law as shown in the Lockwasher and McCullough cases as hereinbefore cited and hereinafter referred to more at length.

The primary purpose of our patent system is not reward to the individual but the advancement of the arts and sciences. A patent monopoly is not a certificate of merit, but rather an incentive to disclosure. Sinclair & Carroll Co. v. Interchemical Corp., 1945, 325 U.S. 327, 330–331, 65 S.Ct. 1143, 89 L.Ed. 1644; United States v. Masonite Corp., 316 U.S. 265, 278, 62 S.Ct. 1070, 86 L.Ed. 1461. It is a grant of the right to exclude others from making, using or vending one's invention, and this includes the exclusive right to license others to make, use or vend it. The patent grant is nothing more than a means of preventing others, except under license from the patentee, from appropriating his invention. Special Equipment Co. v. Coe, 1945, 324 U.S. 370, 378, 65 S.Ct. 741, 89 L.Ed. 1006. It was early in our history recognized that the patent monopoly was thus narrowly limited and defined. Bloomer v. McQuewan, 1852, 14 How. 539, 548, 55 U.S. 539, 14 L. Ed. 532; see generally, United States v. Vehicular Parking, Ltd., D.C.Del.1944, 54 F.Supp. 828, 835.

The public interest being paramount in our patent system, the courts have quite consistently rejected any attempt to enlarge the patentee's narrow "right to exclude." Such attempts for a number of years were made in the form of "tie-in" provisions, wherein the patentee granted to another the right to make, use or vend the invention upon certain conditions which tended to control other patentable or unpatentable inventions or discoveries and create a monopoly not included in the patentee's statutory grant. The line of cases refusing such attempts to expand a patent monopoly commences at least as early as 1917 with the case of Motion Pictures Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871, L.R.A.1917E, 1187, Ann. Cas.1918A, 959, and runs through Interna--

tional Salt Co. v. United States, 1947, 332 U.S. 392, 68 S.Ct. 12, and United States v. Line Material Co., 1948, 333 U.S. 287,[6] 68 S.Ct. 550.

In 1942 it was pointed out by the Supreme Court that "In construing and applying the patent law so as to give effect to the public policy which limits the granted monopoly strictly to the terms of the statutory grant * * * the particular form or method by which the monopoly is sought to be extended is immaterial." United States v. Univis Lens Co., Inc., 316 U.S. 241, 62 S.Ct. 1088, 1094, 86 L.Ed. 1408, see also Galion Metallic Vault Co. v. Edw. G. Budd Mfg. Co., 3 Cir., 1948, 169 F.2d 72, 75.

There soon followed the decision of the Court of Appeals for the Third Circuit in National Lockwasher Co. v. George K. Garrett Co., 3 Cir., 1943, 137 F.2d 255, 256, wherein the above statement of principle was expressly applied in a direct infringement suit by a plaintiff-patentee who had licensed various manufacturers to utilize its patent in making spring washers. Each of the plaintiff's license agreements in the cited case contained a provision in which the "Licensee agrees that while this agreement is in force, it will make and sell no form of non-entangling Spring Washers except such as are covered by said patent, and that it will not, either directly or indirectly, make or sell Spring Washers of the kind specifically excluded from this license under the provisions of Paragraph First (a) hereof." The defendant in the Lockwasher case apparently was not one of the plaintiff's licensees but was rather a competing manufacturer of springs. The relationship, or lack of relationship, between plaintiff and defendant was immaterial, however, and the court directed a dismissal of the complaint on the ground that the plaintiff's standard license provision quoted above constituted an unwarranted extension of its patent monopoly. It was recognized by the court that the Lockwasher facts were of a different nature from those involved in most of the prior cases. The court stated that "The patentee in this case is not selling any unpatented goods under a tying-in clause to the licensee. But it is * * * using its patent monopoly to suppress the manufacture of possible competing goods not covered by its patent. * * * [The] patentee is using the lawful monopoly granted by the patent as a means of suppressing the manufacture and sale of competing unpatented articles. * * * A patentee's right does not extend to the use of the patent to purge the market of competing non-patented goods except, of course, through the process of fair competition."

The recent case of McCullough v. Kammerer Corp., 9 Cir., 166 F.2d 759, 761, certiorari denied, 335 U.S. 813, 69 S.Ct. 30, approved and followed the Lockwasher case. The cited case was also a patent infringment case in which the defendant was not the plaintiff's licensee. The plaintiff's one license agreement, however, did provide that the licensee would not, during the term of the license, manufacture, use or rent any device which would be "in competition with the device or devices covered by this license agreement" and would not during such similar time "manufacture, sell, rent, license, use, or in any way do business with the device or devices covered by this agreement or with devices which will come or be in competition with the device or devices covered by this agreement."

In holding that the above provisions extended the monopoly granted by the patent, the court said that "there is no difference in principle between extending the monopoly of the patent by suppressing the manufacture or use of competitive devices, patented or unpatented, and the extension of the monopoly by prohibiting the use in making the patented article of unpatented articles competing with those made by the licensor's subsidiary, held against the public interest in Morton Salt Co. v. G. S.

---

6 The latter two cases were anti-trust actions brought by the United States, but they are based upon the same general theory that runs through the cases in which suit was instituted by a patentee for royalties or infringement. E.g., Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 315 U.S. 788, 62 S.Ct. 402, 86 L.Ed. 363; B. B. Chemical Co. v. Ellis, 314 U.S. 495, 62 S.Ct. 406, 89 L.Ed. 367; Katzinger Co. v. Chicago Metallic Mfg. Co., 329 U.S. 394, 67 S.Ct. 416, 424, 91 L.Ed. 374.

474

Suppiger Co., 314 U.S. 488, 493, [315 U.S. 788], 62 S.Ct. 402, 86 L.Ed. 363. * * * *The method by which the monopoly is sought to be extended is immaterial.* * * * The public, in a system of free competition, is entitled to have the competition of other devices with a patented device and here it is against that public's interest to use the patent to suppress such competition."

■■■ While a patentee-licensor may condition his license upon such terms as are "reasonably within the reward which the patentee by the grant of the patent is entitled to secure," United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362, a condition which suppresses competition with the patented device is not "reasonably within the reward." The public interest is paramount and the patent may not be licensed upon conditions which secure to the patentee a monopoly not granted by the patent office and which it is contrary to public policy to grant. See McCullough v. Kammerer Corp., supra, 166 F.2d at page 763; Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 492, 315 U.S. 788, 62 S.Ct. 402, 86 L.Ed. 363.

■■■ I think the principles of the Lockwasher and McCullough cases are generally controlling in this case, and I find that Paragraph 3 constitutes an unwarranted attempt to extend the plaintiff's patent monopoly. It would preclude the defendant-licensee from being connected in any way with a theatre competing with one covered by the plaintiff's patent, and this is a suppression of competition which is injurious to the public interest under our system of free competition.

I recognize that an identical license provision was involved in Park-In Theatres v. Loew's Drive-In Theatres, D.C.R.I., 70 F. Supp. 880, 887. In the cited case the only objection raised to the paragraph was that it violated the anti-trust laws, and the court found no evidence that plaintiff was engaged in manufacturing or selling in interstate commerce and hence held that there was no warrant for finding the paragraph per se illegal and violative of the Sherman and Clayton Acts, 15 U.S.C.A. § 1 et seq. In the present case the paragraph is objected to only as contrary to public policy and no question of manufacture and sale in interstate commerce is involved. In the cited case, however, the court did state that no evidence showed that plaintiff had misused its patent by exacting a license condition contrary to public policy, but such point apparently was not argued by the parties. The court, however, did hold the defendant liable for royalties under the license agreement prior to its termination, even though the agreement contained the provision identical with Paragraph 3 in the instant license agreement. The Rhode Island District Court was not faced with any law of the circuit such as has been established for the Third Circuit by the Lockwasher case and, indeed, the Lockwasher case was not considered and seemingly was not brought to the court's attention. The McCullough case, of course, was not considered as it arose after the determination of the case now discussed. To the extent that the holding of Park-In Theatres v. Loew's Drive-In Theatres, Inc., might be in conflict with my holding in the instant case, viz., that Paragraph 3 was an attempt to extend the bounds of the plaintiff's patent monopoly, I feel constrained to disagree with the conclusion of the learned court.

■■■ 4. The fourth question as presented by the plaintiff is, "If in fact paragraph 3 did attempt to extend the bounds of plaintiff's lawful monopoly beyond the scope of its patent, is this illegal and does it render the patent unenforceable?" In extension of the views expressed under question 3 it must be borne in mind that the present controversy arises solely from an inspection of the complaint and exhibits attached thereto and is presented by a motion to dismiss the complaint. There has been no hearing or evidence or any other procedure by which any factual circumstances could be shown. There may be presented the exact nature of the "public interest" which would be involved in a contractual extension or misuse of a patent monopoly. If this "public interest" necessarily and solely arises from the removal or limitation of competition, the question may arise as to whether there is in fact any patented or unpatented instrumental-

ity or process which is or may come into competition with the patented device involved.

In the two cases hereinbefore cited the existence of existing competition was set forth. In the Lockwasher case, 137 F.2d 255, 256, it is said, "It is not disputed that there are other forms of unpatented non-tangling spring washers than those involved in the Loutrel patent." In the McCullough case, 166 F.2d 759, it seems clear that other pipe cutting devices had existed and were driven from the field of competition by the patented article involved and that the users of the patented article had supplanted all other pipe cutters. It was therefore held that the covenant by the licensee, holder of the monopoly of pipe cutting, that it would not manufacture or use any device in competition with the patented article did, in fact, suppress competition and enlarge the monopoly of the patent.

On the other hand, if "public interest" only exists where competition is actually limited or discouraged and there is in fact no competition to be limited or discouraged, the question might arise as to the liability of the defendants for the payment of royalties which they had contracted to pay.

I do not now say that the present existence of actual competition is necessary to show that a contractual limitation of competition is an enlargement or extension of a patent monopoly and against public interest. Nor do I now say that the mere presence in a contract of language clearly restraining competition, and without actual proof of existing competitive devices or processes, may not be sufficiently against public interest as restraining potential competition so as to make the contract an enlargement of the patent monopoly. I prefer rather to exercise my rights under the Rules.

Under Rule 12(d) the determination of a motion to dismiss the complaint may be deferred. Montgomery Ward & Co. v. Schumacher, D.C.N.D.Cal., 3 F.R.D. 368 and cases therein cited.

I am of the opinion that the disposition of the motion to dismiss should be deferred until subsequent proceedings may produce facts which will require the exact application of the Lockwasher and McCullough cases, or the non-production of facts showing existing competition with the patented device involved may give rise to a consideration of the application of the principle of the Lockwasher and McCullough cases unconnected with such facts.

The disposition of the motion to dismiss the complaint is deferred with leave to the defendants to renew such motion at some subsequent appropriate time.